# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISON

| | |
|---|---|
| Carlyle Development, LLC, | Civil Action No.: 3:25-cv-13250-MGL |
| Plaintiff, | |
| v. | **COMPLAINT** (JURY TRIAL DEMANDED) |
| City of Camden, | |
| Defendant. | |

Plaintiff Carlyle Development, LLC ("Plaintiff" or "Carlyle"), complaining of Defendant City of Camden ("Defendant" or "City"), hereby alleges as follows:

## INTRODUCTION

1. This matter involves retaliatory actions taken by the City to punish Carlyle for challenging the City's conduct in court, to render the subject property unmarketable, and to further appropriate the property for public use.

## PARTIES

2. Plaintiff is organized and exists under the laws of the State of Delaware.

3. Defendant is a municipality in Kershaw County, South Carolina.

## JURISDICTION AND VENUE

4. Jurisdiction is proper under 28 U.S.C. §1131, as there are claims involving federal questions. The Columbia Division is proper as this involves matters in Kershaw County.

## GENERAL ALLEGATIONS

5. Plaintiff owns several hundred acres of mostly contiguous real property in Kershaw County, approximately ninety-three acres of which are located within the City's municipal borders.

6. For decades, Plaintiff operated a thoroughbred horse training facility known as the Camden Training Center (the "Center") on a large portion of its property.

7. Due to numerous changes in both the state and national equine industries, the number of horses stalled at the Center drastically diminished to the point where there were no horses left at the Center, and the Center permanently closed.

8. To make economic use of its now vacant property, and consistent with then-existing zoning rules, Plaintiff began efforts to develop its property into residential housing.

9. From the time Plaintiff purchased its property over two decades ago, the Camden-portion of its property has been primarily zoned R-15 with a small portion zoned R-10, which meant that residential housing could be built with lot sizes of at least 15,000 and 10,000 square feet, respectively. The County-portion of Plaintiff's property has been zoned R-6, which allowed for even denser residential development.

10. Plaintiff purchased its property in part because of the option to develop it into residential housing.

11. As further alleged in the pending civil action captioned *Carlyle Development, LLC v. City of Camden, et al.*, C/A No. 3:24-cv-05697-MGL, after deciding to close the Center, Plaintiff approached the City in the spring of 2023 regarding a plan to annex the Kershaw County portions of its property into the City to facilitate a cohesive master development plan.

12. An extensive planning process followed, and at the City's direction, Plaintiff prepared a traffic study, economic impact analysis, and other requested information, and drafted and revised plans in accordance with the directions and preferences of City personnel.

13. Approximately a year later, even though City staff formally recommended approval of Plaintiff's annexation and development plan, the City's Planning Commission denied Plaintiff's proposal, and at the urging of City personnel, Plaintiff withdrew its annexation petition.

14. At that time, Plaintiff submitted development plans to both the City and Kershaw County, and in response the City and the County undertook a series of improper administrative actions and regulatory changes to deny Plaintiff building permits.

15. Over the next year, *inter alia*, the City and County:

    (a) Increased certain minimum residential lot size requirements from 6,000 square feet to 15,000 square feet per lot in response to Plaintiff's plans;

    (b) Increased the same minimum lot sizes to 21,780 square feet per lot;

    (c) Refused to consider Plaintiff's plans based on unpublished code changes;

    (d) Changed interpretations of local code to justify denying Plaintiff's plans;

    (e) Created procedural delays and called numerous special meetings to rush rule changes directed at Plaintiff;

    (f) Improperly refused to issue conditional approvals or otherwise consider compliant plans based on pretextual technical issues;

    (g) Eliminated certain patio home conditional uses in response to Plaintiff's plans;

    (h) Improperly invoked the Pending Ordinance Doctrine to deny plans submitted prior to the first reading of the new ordinance;

    (i) Refused to permit numerous development plans that were compliant with local code and that were formally recommended for approval by staff;

    (j) Informed Plaintiff that permits would be issued if Plaintiff changed certain aspects of its plans but nonetheless denied the plans after Plaintiff made the requested changes;

    (k) Failed to conduct necessary fact-finding when evaluating Plaintiff's plans;

    (l) Erroneously invoked contradictory portions of the Comprehensive Plans as justification for its actions;

(m) Based decisions on backchannel documents without providing Plaintiff the opportunity to review and respond to the allegations contained within those documents;

(n) Abused their discretion by making decisions without adequate determining principles and without fixed rules and standards;

(o) Denied Plaintiff's plans on the sole basis that Camden is "horse country"; and

(p) Passed moratoriums on residential subdivisions in response to Plaintiff.

16. It was communicated to Plaintiff that if Plaintiff did not sell, the City and County would depress the value of Plaintiff's property by preventing Plaintiff from developing the property.

17. After the City Planning Commission refused to permit a *third* compliant plan submitted by Plaintiff (after having improperly changed and/or ignored its rules and procedures to justify denying the prior two plans), Plaintiff filed the above referenced federal lawsuit asserting causes of action for due process and equal protection violations, inverse condemnation, and civil conspiracy for the variety of improper actions and motives underlying the denial of Plaintiff's various code-compliant development plans.

18. While that lawsuit was pending, and because the City's building moratorium was set to expire on October 1, 2025, the City undertook a rushed effort to downzone a large portion of Plaintiff's real property within the City from R-15 to Residential Estate (or "RE"). This downzoning is the basis for the instant lawsuit.

19. The specific property being downzoned is an approximately 61-acre parcel identified by the street address of 2200 Carter Street and is further identified by Tax Map Number C270-00-00-013 (hereinafter, "the Property").

20. The downzoning changes the required minimum residential lot size on the Property from 15,000 square feet to 66,000 square feet, i.e., the ordinance increases the minimum lot size on the Property by *over four times* its prior requirement. *See* Camden Muni. Code § 157.082.

21. City code states that RE zoning districts are "intended to foster, preserve and protect areas of the community in which the principal use of the land is for detached, single-family dwellings, and limited residential support facilities at *very low densities*." *Id.* at § 157.06(A)(1) (emphasis added).

22. The City's ordinance targeted only the Property and did not change the zoning for any adjacent properties or any other properties in Camden. *See, e.g.*, City Ordinance No. 2025-026, attached hereto as **Exhibit 1**.

23. Upon information and belief, all adjacent and surrounding properties in the City are zoned either R-15 or the more permissive R-10, which has a minimum residential lot size of 10,000 square feet. *See* City of Camden Zoning Map, attached hereto as **Exhibit 2**. (The Property has been marked with a red "X," and the nearby non-highlighted lots are in Kershaw County outside the City's jurisdiction and zoned R-6).

24. At the time the City published its public hearing notice for the new ordinance, the *only* document available for public review was a copy of the proposed ordinance. The City's staff report was not provided to Plaintiff until after 5:00 p.m. on Friday, September 26, 2025. The City's Planning Commission held its public hearing on the ordinance at a specially-called meeting on Monday, September 29, 2025, and on Tuesday, September 30, 2025, the City Council approved the ordinance.

25. At no point in this legislative process did the City have any dialogue with Carlyle about the rezoning of the Property; nor did the City analyze whether it is economically feasible to develop the property under such highly restrictive zoning.

26. In fact, it is not economically feasible to develop the Property under the City's new ordinance. For example, there has been no development of any vacant land under the RE zoning in Camden, and the necessary roads, utilities and related infrastructure can only be delivered to the Property when developing at scale.

27. The City's motivation behind rezoning the Property, as with its prior actions involving Plaintiff's properties, is to force Plaintiff to sell his land at a far-below market value price to interested parties and/or to appropriate the properties for public use as either a non-profit equine-related property or open space.

28. The City's justifications for the rezoning are pretextual and inconsistent with the City's Comprehensive Plan.

29. For example, as detailed in its written order dated August 20, 2024, the City Planning Commission's entire purported basis for denying (or refusing to consider) Plaintiff's development plans for the Property was "the preservation of equine facilities" and related Comprehensive Plan objectives regarding goals, objectives, and strategies associated with the equine industry. However, the City has now conceded that an equine training facility is a non-conforming use for the Property, and according to the City's Planning & Development Director, "an equine training facility use cannot be established on the property" regardless of whether it is zoned R-15 or RE.

30. When denying Plaintiff's development plans before, the only verbal justification City Planning Commission Chairman Johnny Deal could muster is that "Camden is horse country."

But the Property could not be used for equine training then and cannot be used for equine training now as such a use is both economically unfeasible and legally restricted.

31. On the other hand, as detailed in the City's recently-published Land Use Addendum, and as further established over the last two years at various public hearings involving the Property, vocal residents and other individuals requested that large undeveloped tracts of land like the Property be used for "public uses" such as a park and for enhancing Camden's stature as an "equine community." In particular, the City asked certain residents how vacant properties such as the Property should be developed, and "[n]o or lower density on CTC property" was identified as a "strong preference" and incorporated into the City's planning study findings.

32. As shown in its conduct over the last several years and through its recent downzoning of the Property, the City considers the Property a public asset and either changes or refuses to follow its rules and regulations to prevent the Property from being developed.

33. The City's regulatory schemes have caused the Property to become uneconomic. The only feasible and legal use of the Property is for residential subdivision, but the City simply will not allow Plaintiff to develop the Property under any conditions.

34. The City's conduct has drastically diminished the Property's value and has caused Plaintiff to suffer substantial business losses. The City has taken all the benefit from the Property and left Plaintiff with the burdens. Plaintiff has to pay taxes and pay for premises liability insurance and other maintenance costs, but the City will not let Plaintiff make economic use of the Property. As is, Plaintiff is forced to either hold the Property in trust for the public good or sell the Property for a fraction of its market value.

35. Upon information and belief, the City's downzoning was retaliation against Plaintiff for filing its prior federal complaint and for its attempts to develop the Property.

7

## FOR A FIRST CAUSE OF ACTION
### (Inverse Condemnation)

36. Plaintiff realleges each and every allegation set forth above as if repeated verbatim herein.

37. The City has engaged in a series of affirmative, positive, and aggressive acts towards Plaintiff culminating with its latest action downzoning the subject property.

38. The City's actions have been for a purportedly public use. For example, the City has refused to let Plaintiff develop the Property into residential housing in order to support the equine industry and/or to secure open space.

39. As a direct and proximate result of the City's conduct, Plaintiff has been deprived of the use and enjoyment of the Property, and the value of the Property has been significantly diminished.

40. Because the City refuses to let Plaintiff develop the Property, Plaintiff has been deprived of all economic use of the Property, and the City's conduct amounts to a categorial *per se* taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992).

41. In the alternative, to the extent the City would let Plaintiff develop at an extremely low residential density, the contravention of Plaintiff's investment-backed expectations, the severe market value diminution of the Property, and the discriminatory and exploitative character of the City's conduct amount to a regulatory taking under *Penn Central Transportation Company v. New York City*, 438 U.S. 104 (1978).

42. As a result, the City is liable to Plaintiff for the uncompensated taking of the Property pursuant to the Fifth Amendment of the United States Constitution and the Constitution of the State of South Carolina, Art. I, § 13, and Plaintiff is entitled to an award of just compensation in amount to be determined by a jury.

## FOR A SECOND CAUSE OF ACTION
### (Unconstitutional Spot Zoning)

43.     Plaintiff realleges each and every allegation set forth above as if repeated verbatim herein.

44.     Carlyle has a valid property interest in the above-described real property.

45.     The City has taken actions that violate Carlyle's rights under the Fifth and Fourteenth Amendments to the United States Constitution, including both procedural and substantive due process violations.

46.     The City's actions have been unreasonable, inconsistent, and lack a legitimate basis.

47.     Specifically, the City has engaged in illegal spot zoning or reverse spot zoning wherein the City has singled out the Property for a use classification that is different from the surrounding area to the detriment of Plaintiff and for the benefit of others. *See, e.g.*, *Ani Creation, Inc. v. City of Myrtle Beach Bd. of Zoning Appeals*, 440 S.C. 266 (S.C. 2023) (clarifying that "reverse spot zoning occurs when zoning ordinance restricts the use of a property when virtually all the property's adjoining neighbors are not subject to the use restriction").

48.     None of the properties adjacent to or anywhere near the Property are zoned RE (i.e., the City has created a "zoning island"), and Plaintiff's Property was singled out not only for disparate treatment, but to advance illegitimate interests—the forced sale and/or appropriation of Plaintiff's properties. *See Ani Creation*, 440 S.C. at 282-284 (identifying the Court's responsibility to correct clear injustices that result from municipal action).

49.     The City did not consider all relevant facts during its legislative process. In particular, it did not conduct any economic feasibility analysis to determine whether the Property could be developed under the new zoning, nor did it give any consideration to the financial impact of downzoning on the market value of the Property. *See, e.g.*, *Bob Jones University, Inc. v.*

*Greenville*, 243 S.C. 351 (S.C. 1961) (explaining that municipalities must considering "all of the facts" in order to receive a presumption that their actions are valid).

50. In the alternative, the City understood the financial implications of downzoning the Property—that development would be impossible under the new zoning conditions—and proceeded with the downzoning to punish Plaintiff and to advance the City's goal of appropriating the property for public use.

51. The downzoning is inconsistent with numerous provisions in the City's Comprehensive Plan. *See Knowles v. Aiken*, 305 S.C. 219, 223 (S.C. 1991) (explaining that courts should "closely scrutinize" whether the rezoning measures adheres to the municipality's comprehensive plan).

52. For example, in its 2025 Housing Addendum, the City recognized that "there is need for homes at prices that are affordable for younger buyers, empty-nesters, and retirees;" "that it is very difficult to find homes for first time buyers that are move-in ready;" and that "older residents are looking to 'downsize' by moving into housing that is smaller, requires less maintenance, and is less expensive." Nonetheless, the City has refused to let the Property be developed and advance these objectives because of personal animus and improper agendas.

53. Moreover, the City revised its Comprehensive Plan three years earlier than scheduled in an attempt to justify both its improper denials of Plaintiff's prior plans and its ongoing efforts to appropriate the Property.

54. The City's pattern of conduct towards Plaintiff is discriminatory and unprecedented as it has not treated any other property owner in the way it has treated Plaintiff over the last several years—to wit, the City refused to approve plans submitted in conformity with City code, changed

10

its code, and deviated from its rules and procedures to deny permits to Plaintiff and keep the Property vacant—and now it has further targeted Plaintiff and the Property for disparate treatment.

55. The City's actions have gone far beyond the boundaries of legitimate governmental activity, and have targeted, interfered with, and deprived Plaintiff of its property interests.

56. In a rushed and pre-determined process, the City decided to downzone the Property prior to any public hearing or consultation with Plaintiff, and Plaintiff was not provided an opportunity to be meaningfully heard prior to this decision being made.

57. In sum, the City's conduct has been arbitrary, capricious, unjust, and has created unfair burden on Plaintiff.

58. As a direct and proximate result of the City's actions, Plaintiff has been damaged in an amount to be more specifically proven at trial.

**WHEREFORE**, Plaintiff prays for a judgment against the City for an order:

(a) Declaring that the downzoning of the Property amounts to impermissible spot zoning;

(b) Enjoining the City from enforcing its new ordinance;

(c) Awarding actual, special, and consequential damages in an amount to be proven at trial;

(d) Granting costs associated with bringing this action, including reasonable attorneys' fees and other expenses as permitted by S.C. Code Section 28-11-30(3); and

(e) For such other and further relief as the Court my deem just and proper.

        Respectfully submitted,

        LEWIS BABCOCK L.L.P.

        *s/ Joseph B. Berry*
        Joseph B. Berry (D.S.C. Bar No. 12883)
        1513 Hampton Street (29201)
        Post Office Box 11208
        Columbia, South Carolina 29211
        (803) 771-8000
        jbb@lewisbabcock.com

        ATTORNEYS FOR PLAINTIFF

Columbia, South Carolina
November 3, 2025